UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
GEORGE KOFINAS & MARIA KOFINAS,          :
                                         :
      Plaintiffs,                        :    20-cv-7500 (JSR)
                                         :
  -v-                                    :    FINDINGS OF FACT,
                                         :    CONCLUSIONS OF LAW,
FIFTY-FIVE CORP., et al.,                :    AND ORDER DIRECTING
                                         :    ENTRY OF FINAL JUDGMENT
                                         :
      Defendants.                        :
                                         :
------------------------------------------x

JED S. RAKOFF, U.S.D.J.

    Drs. George and Maria Kofinas ("the Kofinases"), the Plaintiffs
here, are physicians who specialize in reproductive endocrinology and
infertility. They purchased the stock ownership of three apartment
units on the ground floor of 55 Central Park West ("the Building"), a
more than 90-year-old landmark building owned by defendant Fifty-Five
Corporation ("the Corporation"), with the intent to convert the space
into a clinic for their practice, Kofinas Fertility Group. The units
experienced water penetration in 2015, as the Kofinases were renovating
them, and again in 2019. When the Kofinases learned that mold had
begun to grow in the units, they closed the clinic for more than five
months.

    The Kofinases allege that in 2015, against the advice of the
Building's architect, the Corporation and its representatives pursued
a "cheap and quick" solution to the water penetration, rather than one
that would be more durable. The Kofinases claim this approach left
their units vulnerable, and when leaks entered the Units again in

1

2019, the Kofinases allege that the Corporation's dilatory response failed to prevent the damage that led them to cease operations. The attention they received from the Corporation and its representatives, the Kofinases allege, contrasts sharply with the millions of dollars the Corporation spent on repairs and luxuries to benefit residential tenants, including a new roof garden and a lobby renovation so resplendent it garnered an architectural award.

The Kofinases sued the Corporation, plus seventeen individuals who served as members of the Corporation's board during the period when the Kofinases have been shareholders ("the Individual Defendants"), as well as the Corporation's managing agent and the agent's realty management company (collectively, "the Managing Agent"). (The Corporation, the Individual Defendants, and the Managing Agent are collectively referred to as the "Defendants.") The Kofinases brought common law claims for (1) breach of contract, against the Corporation; (2) negligence, against the Corporation; (3) breach of fiduciary duty, against the Individual Defendants; (4) tortious interference with contract, against the Individual Defendants; (5) aiding and abetting breach of fiduciary duty, against the Managing Agent; and (6) aiding and abetting tortious interference with contract, against the Managing Agent. See ECF No. 65. The Kofinases sought compensatory damages, including business interruption damages, and punitive damages. Id.

On February 1, 2021, the Court dismissed Plaintiffs' claim for tortious interference with contract, their claim for aiding and

abetting tortious interference with contract, and all claims for punitive damages. See ECF Nos. 80, 82. This left for trial the Plaintiffs' claims for breach of contract, negligence, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. See id.

The Proprietary Leases the Kofinases signed with the Corporation provide that the parties waive trial by jury in any legal action brought in connection with the leases. PX 33, 34, 35, Article V, ¶ THIRD. Accordingly, the Court conducted a bench trial and this was done, with the parties' consent, over video connection. The Court bifurcated the trial, with an initial liability trial to be followed by a trial on damages if any liability were found. Trial Tr. 393:18-394:1. The trial commenced on June 2, 2021, and lasted for six days. At trial, the Court received 101 exhibits and heard testimony from nine witnesses: John Wender, Kamyar Biazar, Justin Wilde, Peter N. Greenwald, Frederick Rudd, William Struth, Guglielmo Ammatuna, George Kofinas, and Demetrios Boutris. With the parties' consent, a portion of the deposition transcript of Maria Kofinas was read into the record. On June 21, 2021, the parties submitted post-trial memoranda in lieu of oral summations. See ECF Nos. 88, 89. On June 28, 2021, the parties submitted rebuttal memoranda. See ECF Nos. 102, 103.

The Court has carefully reviewed the parties' pre-trial submissions, the transcript of the trial, the trial exhibits, and the parties' post-trial submissions. In addition, the Court has made credibility determinations based, among other things, on its

observation of each witness's demeanor and the consistency and logic of the witness's testimony. Based on all this, the Court, on July 12, 2021, by bottom-line order, granted judgment in favor of Defendants, thus obviating the need for a trial on damages. Pursuant to Federal Rule of Civil Procedure 52(a), this Opinion provides the Court's findings of fact and conclusions of law, and directs the entry of final judgment dismissing the complaint.

## Findings of Fact

Kofinas Fertility Group operates four offices in Manhattan, Brooklyn, and Staten Island, New York. Trial Tr. 788:16-789:3. The offices include fertility clinics, laboratories, and surgical centers. Id. Dr. George Kofinas is founder, chief executive officer, medical director, and owner. Trial Tr. 787:21-24. Dr. Maria Kofinas also practices with the group.

The Corporation is a cooperative housing corporation that owns the Building, which was constructed in 1929. Trial Tr. 59:5-6; 106:15-16. The Individual Defendants, Peter N. Greenwald, Jane Majeski, Paul J. "PJ" Mode, Stephen Farinelli, Dr. Ronald Blum, David Hendin, Marc Lasry, Robin Baum, Stewart Lipson, Sean Gallagher, Meredith Segal, David Cudaback, Paula Dagen, Lauren Helm, Paula Wardynski, Jeffrey Levy, and John Santoleri, were members of the Board of Directors of the Corporation ("the Board") at various times during the period covered by the Kofinases' Amended Complaint.

At any given time, the Board has nine members. Trial Tr. 324:18–19. Defendant Greenwald served as president of the Corporation throughout the period of time covered by the Amended Complaint, although he was not a voting member during a period of approximately one year in 2015 and 2016. Trial Tr. 323:21–324:8. The Managing Agent, Frederick Rudd and Rudd Realty Management Corp., began their service for the Building on October 1, 2015. PX 46.

The Kofinases are citizens of New Jersey. Defendants reside, or are incorporated and have their principal place of business, in New York. The Court's subject matter jurisdiction sounds in diversity.

In 2014, the Kofinases purchased the ownership stock for two apartment units, labeled 1B and 1C, at the Building. The Proprietary Leases for units 1B and 1C were signed June 25, 2014, by the Kofinases and by Defendant Greenwald, as president of the Corporation, on the Corporation's behalf. PX 33–34. In 2015, the Kofinases purchased the ownership stock for a third unit, labeled 1D/HW. The Proprietary Lease for unit 1D/HW was signed November 30, 2015, by the Kofinases and Defendant Greenwald, as president, on the Corporation's behalf. PX 35.

The Kofinases acquired units 1B, 1C, and 1D/HW (collectively, "the Units") with the intention of combining them and using them as an office for Kofinas Fertility Group. Trial Tr. 133:13–134:1; see also 793:13–18. The Units sit slightly below the sidewalk level. During the period covered by the Amended Complaint, the Kofinases paid maintenance and special assessments to the Corporation, pursuant to the terms of the Proprietary Leases. Trial Tr. 342:23–343:2. The

5

Proprietary Leases provide in relevant part that the Corporation shall keep the Building "in good repair"; that the Corporation shall "maintain and manage the building as a first-class apartment building"; and that Plaintiffs shall "quietly have, hold and enjoy" the Units. PX 33, 34, 35, Article I, ¶¶ FIRST, SECOND, SEVENTH. The Proprietary Leases make no mention of the use of the Units as a medical clinic. See also Trial Tr. 541:9-542:7.

The Kofinases began to renovate the Units in "late 2015." Trial Tr. 194:5-10. In October 2015, employees of the Kofinases' contractor, Bar Construction Corp., discovered water penetrating into the Units. PX 11; Trial Tr. 135:6-136:11, 194:11-195:1. It was observed that the water was entering through cracks in the sidewalk and in the Building's envelope; from there, the water seeped into the Units. PX 11; Trial Tr. 136:12-18. On or about October 8, 2015, Plaintiffs reported the water penetration to John Wender, an architect whose firm the Corporation had retained as architects for the Building, and Mr. Wender informed the Corporation and Managing Agent that same day. PX 36; Trial Tr. 343:11-17.

Specifically, on or about October 8, 2015, Mr. Wender visited the Units in response to the report of water seepage. Trial Tr. 43:17-44:7. Writing that day to Defendant Greenwald, copying Defendant Rudd, Mr. Wender reported that "[t]here is indeed moisture pooling at the bottom of the interior wall." He characterized it as "moisture, not flooding, a/k/a perched water." He hypothesized that the water source is "likely subterranean." Mr. Wender described several approaches that

might remediate the situation. "[R]e-caulking the sidewalk is cheap and quick," he wrote, but other "possible fix[es]" included "tearing up the sidewalk" to waterproof the Building from the outside, installing an "elaborate injection system[]," or installing an "interior gutter." Mr. Wender recommended that "[i]deally, we would pull in Vidaris on this issue," referring to the engineers the Building was at that time employing on another project. PX 2; 61:8-15; 553:5-554:1. At Defendant Greenwald's request, Mr. Wender contacted Amir Chouan, the Vidaris employee who was the "point person" for the Building. PX 3; Trial Tr. 65:4-615. No documentation of Vidaris's response is extant. The Managing Agent stopped working with Vidaris soon after assuming his role with the Building. Trial Tr. 553:15-24.

The various approaches Mr. Wender proposed each had advantages and disadvantages. Approaches other than recaulking the sidewalk would be "an order of magnitude more expensive" and would likely require the Building to obtain permits from at least both the New York City Department of Transportation and the Landmarks Preservation Commission. Trial Tr. 50:16-51:3, 113:13-22. According to Mr. Wender, the more expensive approaches would not necessarily have prevented the recurrence of water seepage. Trial Tr. 111:13-21. Sidewalk recaulking was "a partial fix as opposed to a permanent fix or a long-term fix." Trial Tr. 56:3-6; see also 159:3-7, 169:16-171:19, 300-01. But recaulking "would always be the first thing to do." Trial Tr. 129:3-6; see also PX 11. Asked his personal view, Mr. Wender testified that "[w]hat I believe needed to occur was to excavate the sidewalk and

waterproof the building wall." Trial Tr. 83:19-25; see also 139:12-19.

By December 2015, as the Kofinases' contractors were completing their work, they reported that they had not heard how the Corporation intended to remediate the water seepage. PX 7; Trial Tr. 75:4-77:22. Mr. Wender testified that he was "waiting to get direction from Vidaris . . . and the management on what they were going to do with regard to waterproofing the sidewalk and the foundation wall." Trial Tr. 77:7-10. Mr. Wender expressed frustration about not "getting direction" from the Managing Agent. Trial Tr. 86:22-87:7.

On or about December 3, John Phufas, the Kofinases' attorney, requested that Mr. Wender "get back to us on the internal waterproofing specifications today to prevent seepage form [sic] the exterior from damaging the new construction." PX 7. Mr. Wender responded with a memo on or about December 3. In the memo, he stated that "I have reviewed the matter with management and the building, and they are obtaining proposals to caulk joints [sic] the building wall and the sidewalk, and make repair as necessary." PX 8. Mr. Wender recommended that because "we can observe that the pointing on the interior face of the masonry wall is seriously deteriorated," the Kofinases' contractor should sound the pointing, remove loose and deteriorated mortar, carry out spot pointing, and apply Aquafin masonry sealer. Id.; see also Trial Tr. 87:20-88:22, 158:23-165:14.

Mr. Wender testified that he believed the steps he recommended, which resembled those he had recommended in similar situations in

other buildings, had been approved by a representative of the Corporation and would "help keep the space dry for some time." Trial Tr. 88:19-22, 119:25-120:19. Treating the walls with Aquafin would be effective but not permanent. Trial Tr. 178:20-179:13. Mr. Wender did not recommend spray testing for the source of the leak because he was not the Building's exterior architect. Trial Tr. 119:7-10. In subsequent emails between Mr. Wender and Kamyar Biazar, an employee of the Kofinases' contractor, Bar Construction Corp., it was decided that the contractor would waterproof the perimeter walls of the Units "up to windowsill height" because "the moisture [was] only occurring at locations below grade." PX 9; Trial Tr. 92:22-93:4, 166:5-17.

Mr. Wender observed the progress of the waterproofing work at least three times in December 2015 and January 2016. PX 10; Trial Tr. 94:24-95:4. On or about January 4, 2016, Mr. Wender directed Mr. Biazar to "proceed with [the] close-up" of the wall. PX 10; Trial Tr. 95:10-23, 166:18-169:23. The wall was closed up shortly thereafter.

The Board discussed the waterproofing of the Units at its meeting on or about December 7, 2015. PX 43. The Building authorized caulking the sidewalks outside the Units. Trial Tr. 172:8-10. According to Defendant Greenwald, the Board considered caulking the sidewalk to be an "immediate," but not necessarily "exclusive," fix. Trial Tr. 359:23-360:3. The approximate cost of the caulking was $9,500. Trial Tr. 359:7-10.

The Units became dry after the Building caulked the sidewalks and the Kofinases' contractor applied Aquafin. Trial Tr. 114:10-12,

172:11-13. The Kofinases finished renovating the Units, and they opened
them as an office of the Kofinas Fertility Group in or around February
2017. Trial Tr. 789:4-6.

The water penetration into the Units in 2015 came at least
partially from the sidewalk, but no other source was proven. Mr. Biazar
testified that the water was coming in through cracks in the sidewalk
and the exterior wall of the Building. Trial Tr. 142:4-11. Several
witnesses testified that the leak was more severe after heavy rainfall.
Trial Tr. 121:14-15, 136:19-23, 199:13-23. Mr. Wender hypothesized
that the leak was subterranean. PX 2.

Beginning in 2017, and unrelated to the Kofinases' Units, the
Corporation hired a structural engineering firm, Antonucci and
Associates. Part of Antonucci's assignment was to determine possible
sources of water penetration into the Building's basement, one level
below the Kofinases' Units. Trial Tr. 299:18-22. The Antonucci
inspections found that bricks were pulling away from steel columns in
the basement and that there were heavy amounts of efflorescence in the
area. PX 15-20; Trial Tr. 243:8-19; see generally 398:9-402:13, 664:9-
667:20. But the inspections detected no water seepage or penetration
from the sidewalk level. Trial Tr. 301:16-2. There is also a main
steam line that runs underneath and adjacent to the Building, and
leaks from the line may have produced both the deterioration observed
in the basement and the water damage and mold growth that had been
reported in another ground-floor apartment in 2014. PX 21, 37; see
generally Trial Tr. 275:16-280:19, 328:2-333:7, 335:15-337:3, 344:12-

10

348:21, 574:9-576:11. But the deterioration could also have come from the operation of the boilers or from naturally occurring humidity in a structure of the Building's age and size. Trial Tr. 294:15-295:4.

Since the Kofinases became shareholders, the Corporation has undertaken several projects to renovate and improve the Building. A long-term, $7.5 million project to waterproof the Building's façade was completed in or around October 2015. PX 46. Plans for a new roof and roof garden, together costing approximately $245,000, began before the Kofinases executed the Proprietary Leases. Trial Tr. 351:23-354:10. The Building also renovated and retrofitted its lobby. PX 48. The Corporation undertook this project, which cost approximately $1.5 million, both for aesthetic reasons and to make the lobby accessible to persons with disabilities. Trial Tr. 367:18-374:8, 123:19-20. To finance the lobby project and related work, the Corporation imposed on shareholders a special assessment totaling approximately $500,000 per year for the calendar years 2019 through 2023. Trial Tr. 372:22-374:8. Throughout the period covered by the Kofinases' Amended Complaint, the Building has had ample access to credit and has not experienced problems with liquidity, although the Board has been cautious to sequence projects with cash flow in mind. Trial Tr. 354:11-14, 480:15-18.

In or around winter 2018, other resident shareholders of the Corporation, including a number of those whose units were located at or near the Building's northeast corner, reported leaks and water damage. E.g., PX 74. Some of those who complained were present or

11

former members of the Board. PX 71, 74. Defendant Greenwald testified that the apartment in which he resided was affected by water damage over a period of "years." Trial Tr. 478:10. On or about May 15, 2019, the Managing Agent distributed a memorandum to shareholders who resided in thirteen apartments affected by "water penetration/leak." PX 75; Trial Tr. 462:6-464:20. One of the affected units was 1A, on the same floor as the Kofinases' Units. PX 75. The Managing Agent's memorandum stated that the Building had engaged Lawless and Mangione, a structural engineering firm, to "advise us on the serious water penetration on the northeast corner of the building." Id.; see also Trial Tr. 654:9-655:4. The Managing Agent also advised the affected shareholders that, "subject to weather conditions," the repairs would be expedited. To complete the repairs, a partial sidewalk bridge would need to be installed. PX 75. The idea was to begin working from the higher floors down, so that water would not leak from them into the lower stories. Trial Tr. 631:17-22. This work, dubbed the "new façade project," began in or around mid-June 2020, in the early months of the COVID-19 pandemic. Trial Tr. 620:9-621:13. The project, originally scheduled to conclude in mid-September 2020, encountered delays and was still ongoing at the time of the trial. Trial Tr. 621:14-25.

Water was again discovered penetrating the Kofinases' Units in or around July 2019. As a result of the water penetration, floors in the Units began to warp, worsening over time. PX 14; Trial Tr. 211:14-212:16, 815:3-8. There was also a musty smell. Trial Tr. 815:13-18. Although the water penetration began in or around July, the Kofinases

reported the water penetration to the Building, the Managing Agent, and the Individual Defendants on or about September 19, 2019. DX G. The Kofinases' initial communication included no mention of mold. The Building engaged Lawless and Mangione, the structural engineering firm that was already advising on the leaks in other apartments, to investigate. Lawless and Mangione reported that there was water damage in the floorboards of the Units and wet areas on the masonry walls. PX 59. A contractor, Standard Waterproofing, conducted spray testing on or about October 23, 2019. PX 60; Trial Tr. 675:12-19. The spray testing indicated that water was entering from multiple sources around the Building's perimeter. Trial Tr. 675:20-679:19; see also 205:6-16. No evidence of a subterranean leak or steam leak was found. Trial Tr. 736:17-20, 769:1-16. Lawless and Mangione recommended that the stone units below the windows of the Units be removed and reset, that the sidewalk flags along the building wall be removed so that the foundation wall could be waterproofed, and that a new sidewalk be installed. PX 60; Trial Tr. 679:20-687:18.

Lawless and Mangione prepared plans for the necessary repairs, which received approvals from the New York City Landmarks Preservation Commission, the Metropolitan Transportation Authority, and the New York City Department of Buildings. PX 93; Trial Tr. 695:18-698:4. The final necessary approval was granted between March 9 and March 26, 2020. PX 93; Trial Tr. 697:22-24. In the meantime, on or about December 11, 2019, Dr. George Kofinas reported to Defendant Greenwald that

water could be heard squishing under the floorboards and that he was concerned about mold growth. PX 64.

As of trial, the repairs recommended by Lawless and Mangione have not yet been undertaken because the Corporation chose to prioritize the new façade project. The Corporation has given two sets of reasons for this decision. First, other shareholders had been experiencing leaks for a longer period of time than the Kofinases. Second, if the sidewalk work were completed first, the façade work would be delayed while the sidewalk cured, and in addition the new sidewalk would be damaged by the bridge that would need to be built in order to complete the façade project. PX 71. The Kofinases objected to this prioritization. E.g., PX 68.

Following the Kofinases' report of new water penetration, relations between the Kofinases and the Corporation deteriorated. See PX 90; Trial Tr. 844:16-845:20. A representative of the Kofinas Fertility Group requested copies of the Lawless and Mangione reports following the October 2019 spray testing. PX 61-64. The Managing Agent did not immediately provide them but, at Defendant Greenwald's insistence, did so approximately three weeks later. PX 62, 63, 64, 91; see Trial Tr. 595:10-602:18. Correspondence from November 2019 through January 2021 indicates that the Kofinases and their representatives regularly requested updates on the repairs affecting the Units, but were not satisfied with the responses they received from the Managing Agent. For his part, Defendant Greenwald repeatedly asked the Managing Agent to convene a meeting with the Kofinases and relevant contractors

and to provide the Kofinases with information concerning the planned work. PX 67-69, 74.

On or about February 21, 2020, the Kofinases initiated an Article 78 proceeding in New York state court in which they sought access to other records in the Corporation's possession, including documents concerning the new façade project and the planned repairs affecting the Units. Kofinas v. Fifty-Five Corp., No. 151914/2020 (N.Y. Sup. Ct.), Dkt. 1. In August 2020, Defendant Greenwald submitted an affidavit in opposition to the Article 78 proceeding. PX 66. In the affidavit, he stated that the Corporation had explained to the Kofinases that the Corporation had decided to prioritize repairs to the Building's façade over the sidewalk repairs. This was because, Defendant Greenwald stated, waiting "a number of months" for the sidewalk to cure would delay the erection of a sidewalk shed. PX 66. The Corporation's attorney, Phyllis Weisberg, submitted an affirmation containing substantially similar statements. PX 88. However, the Lawless and Mangione manual indicated that concrete takes only fourteen days to cure; other evidence suggested that twenty-eight days, but still not "months," was a more realistic estimate. PX 65, Trial Tr. 692:12-693:7. Eventually, the Kofinases dismissed the Article 78 proceeding. Kofinas v. Fifty-Five Corp., No. 151914/2020, Dkt. 26.

In February and May 2020, the Kofinases engaged two environmental consultants to measure the presence of mold spores in the Units. Both reports documented elevated levels of Aspergillus/Penicillium spores. The first report, dated February 11, 2020, indicated there was "no

active growth at site" but warned that "continued water penetration will result in fungal colonization at these areas." PX 83. The consultant recommended that the water penetration issues be corrected, that a professional mold remediation be done, and that the duct network for the central air conditioning system be professionally cleaned and sanitized. PX 83. After receiving this report, the Kofinases closed the Clinic on or about March 5, 2021, which the Kofinases said they did in order to conduct repairs necessary to ensure the Clinic's sterility. Trial Tr. 805:14-24, 819:22-821:18. Kofinas Fertility Group's other clinics remained open, notwithstanding the outbreak of the pandemic. Trial Tr. 821:21-822:3. The second mold report, dated May 11, 2021, indicated "growth present under the floor" as well as in the air. PX 82. It recommended substantial remediation work, including replacing the floors and cleaning the underlying concrete slab. PX 82. The Managing Agent sent copies of the mold reports to another expert, Denis Stock, who affirmed the reports' recommendations. PX 84. On or around May 14, 2020, Defendant Greenwald sent an email to Mr. Rudd, Ms. Weisberg, and a staff member of the Managing Agent in which he stated his belief that while "[t]he water penetration is real," there was "[n]o mold" in the Units. PX 81.

Representatives of the Kofinases and the Corporation continued to debate the sequencing of the new façade project and the repairs affecting the Units. PX 86, 87. Eventually, as a temporary repair, the Kofinases asked that a sealant known as Chem-Trete be applied to the sidewalk around the Units. Trial Tr. 539:6-16. The Corporation agreed,

and the sealant was applied in or about May 2020, at a cost to the Corporation of no more than $3,900. PX 80, 85; Trial Tr. 618:3-9. On or around May 27, 2020, the Corporation, at the suggestion of the Kofinases' representatives, engaged Lawless and Mangione to conduct a second water test. Trial Tr. 475:6-24, 712:8-11. The test showed that the application of Chem-Trete to the outside of the Units had failed to prevent the intrusion of water. Trial Tr. 475:6-24. A second application of Chem-Trete, in or about July 2020, was successful, as demonstrated by the results of a third water test conducted on or around July 22, 2020. PX 79, 80; Trial Tr. 475:14-18, 477:10-16, 717:17-719:12. The Kofinases have not subsequently reported water penetration to any representative of the Corporation, despite several rainstorms and snowstorms occurring from July 2020 through the time of trial. Trial Tr. 635:25-636:4.

The Kofinases reopened their clinic in the Units in or around August 2020. <u>See</u> Trial Tr. 822:4-8. This litigation followed.

### Conclusions of Law

Against this factual background, the Kofinases argue that the Corporation breached multiple provisions of the Proprietary Leases; that the Corporation was negligent in responding to the water penetration; that the Individual Defendants breached their fiduciary duty as members of the Board; and that the Managing Agent aided and abetted that breach of fiduciary duty. For the reasons that follow,

the Court concludes that none of the Defendants is liable on any of the Kofinases' claims.

## I. Breach of Contract

Under New York law, "to prevail on a breach of contract claim . . . a plaintiff must prove [i] a contract; [ii] performance of the contract by one party; [iii] breach by the other party; and [iv] damages." Nielsen Co. (U.S.), LLC v. Success Systems, Inc., 112 F. Supp. 3d 83, 97 (S.D.N.Y. 2015). The first two elements are not contested here: the parties do not dispute that the Proprietary Leases constitute properly formed contracts between the Kofinases and the Corporation, nor do they dispute that the Kofinases performed their obligations under the Proprietary Leases.

As to the third element, the Kofinases argue that the Corporation breached its obligations under three provisions of the Proprietary Leases. The provisions concern the Corporation's obligation to keep the building in "good repair," to maintain a "first-class apartment building," and to ensure the Kofinases' quiet enjoyment of the Units. Under none of those provisions have the Kofinases met their burden of proof.

### A. Good Repair Provision

The first Proprietary Leases provision the Kofinases allege the Corporation breached is the "good repair" provision. It provides, in relevant part, that

The Lessor shall keep in good repair the foundations, sidewalks, walls, supports, beams, roofs, gutters, fences, cellars, chimneys, entrances and street and court doorways, main halls, main stairways, windows, laundries, fire escapes, elevators, pumps and tanks, and all main and principal pipes . . . together with all plumbing, heating and other apparatus intended for the general service of the building, except those portions which it is the duty of the Lessee to maintain and keep in good repair . . . it being agreed that the Lessee shall give the Lessor prompt notice of any accident or defect known to the Lessee and requiring repairs to be made; and all such repairs shall be made at the expense of the Lessor unless the same shall have been rendered necessary by the act or neglect or carelessness of the Lessee." PX 33, 34, 35, Article I, ¶ FIRST.

The good repair provision fits together with another provision of the Proprietary Leases, which provides in relevant part that

The Lessor shall not be liable for any failure of heat, water supply, electric current, telephone or elevator service or other service to be supplied by the Lessor hereunder, or for injury or damage to person or property caused by the elements or by another tenant or person in the building, or resulting from steam, gas, electricity, water, rain or snow which may leak or flow from any part of the building, or from any of its pipes, drains, conduits, radiators, boilers, tanks, appliances or equipment, or from any other place, unless caused by the negligence of the Lessor." PX 33, 34, 35, Article II, ¶ SIXTEENTH.

Together, these provisions establish that for the Kofinases to prevail on a claim for "injury or damage to person or property," they must demonstrate that damage they suffered from "the elements" or from "steam" or "water" was caused by the Building's negligence. Id. For nearly a century, New York courts have construed lease provisions like the one in Article II, ¶ SIXTEENTH, to limit plaintiffs' recovery to situations where a lessor has actual or constructive notice of a defect and acted negligently in failing to address it. Kessler v. The Ansonia, 171 N.E. 704 (N.Y. 1930); Lowy & Feiffer, Inc. v. Mor-Ro Realty Corp., 229 N.Y.S. 169 (1st Dep't 1928). Plaintiffs may also recover if the

lessor engaged in intentional or grossly negligent conduct resulting in the damage from the elements. See Berenger v. 261 West LLC, 940 N.Y.S.2d 4 (1st Dep't 2012).

For the reasons that are detailed later in Section II of this opinion, the Corporation was not legally negligent, and therefore the Kofinases cannot prevail on their claim for property damage arising from the Corporation's breach of the good repair provision. But before getting there, it should be noted that the Kofinases are not seeking redress for just the damage to their property; they seek business interruption damages as well. New York courts regularly cognize business interruption as a different form of harm than property damage. See, e.g., In re Specialist and Other Vessel Owner Limitation Actions, 2020 WL 8665287, *1 (S.D.N.Y. June 30, 2020); Advanced Fertility Services, P.C. v. Yorkville Towers Associates, 875 N.Y.S.2d 894 (Mem.) (1st Dep't 2009); RLI Ins. Co. v. Turner/Santa Fe, 870 N.Y.S.3d 313 (1st Dep't 2009).

Therefore, with regard to the Kofinases' claim for business interruption damages, the Court must consider whether the Corporation failed to keep the Building, including the "foundations" and "sidewalks," in "good repair." PX 33, 34, 35, Article I, ¶ FIRST. The good repair provision does not obligate the Corporation to prevent damage in advance, but instead provides that the Corporation must respond when it receives "notice of any accident or defect known to the Lessee and requiring repairs to be made." Id. The Proprietary Leases also provide that "[i]n case the building shall be partly

damaged by fire or otherwise, the same shall be repaired as speedily as possible, at the expense of Lessor." PX 33, 34, 35, Article I, ¶ THIRD. Reading these paragraphs together establishes that the Corporation's obligation, when it is notified of any damage or defect, is to restore the Building to "good repair" "as speedily as possible."

During the period relevant to this litigation, the Corporation was on notice about several forms of damage that left the Building in less than good repair. The Corporation knew about water penetration and possible mold growth in a ground-floor apartment prior to the time the Kofinases executed the Proprietary Leases; it knew about the water penetration into the Kofinases' Units that occurred during the 2015-2016 renovation; it knew about damage to the steel columns in the basement; and, as of September 2019 at the latest, it knew that water had again begun to penetrate the Kofinases' Units. In some of these instances, it is debatable whether the Corporation took steps to restore "good repair" "as speedily as possible."

But the Kofinases' arguments are insufficient to overcome their burden to demonstrate that the Corporation's breach, if any, resulted in business interruption damages. The Kofinases are not alleging that the pre-existing water penetration and mold growth in a different apartment on the ground floor caused their business interruption damages, nor that the problems with the steel columns in the basement did so.[1] As discussed further below, the steps the Corporation took to

_____

[1]    Summation papers submitted by counsel for the Kofinases draw a parallel between the risk presented by these columns and the recent,

remediate the water penetration into the Units in 2015-2016 were effective for upwards of three years. Regardless, the Kofinases have not demonstrated that the 2019 leak came from the same source as the earlier leaks. Finally, although the Building could have responded more speedily to the penetration of water into the Kofinases' Units in the fall of 2019, the Court finds that at least some of the reasons the Corporation has given (i.e., wanting to prioritize repairs to residential apartments on upper floors) are convincing in reference to the Corporation's responsibility to respond to, and where necessary balance, the needs of all its shareholders.

### B. First-Class Apartment Building Provision

The second Proprietary Leases provision the Kofinases allege the Corporation breached is the "first-class apartment building" provision. It provides, in relevant part, that "The Lessor shall maintain and manage the building as a first-class apartment building and shall provide facilities and the number of attendants requisite in the judgment of the Board of Directors for the proper care and service of the building." PX 33, 34, 35, Article I, ¶ SECOND.

The Kofinases have not demonstrated by even a preponderance of the evidence that the Corporation breached the first-class apartment building provision. The meaning of the term "first-class" is not readily apparent. The Kofinases urge the Court to read the term in light of the definition they find in the second edition of Black's Law

---

horrific collapse of a condominium building in Surfside, Florida. The analogy is at best overstated and at worst offensive.

Dictionary: "[o]f the most superior or excellent [grade] or kind; belonging to the head or chief or numerically precedent of several classes." But the Kofinases neglect the noun that "first-class" modifies, namely, "apartment." The Proprietary Leases are for units in an apartment building, not a medical facility. For reasons discussed further below, there is no evidence that the Kofinases and the Corporation bargained for any higher level of care for the Units, which the Kofinases intended to use as a sterile medical clinic rather than a residence.

### C. Quiet Enjoyment Provision

The final Proprietary Leases provision the Kofinases allege the Corporation breached is the covenant of quiet enjoyment. As articulated in the Proprietary Leases, "The Lessee, upon paying the rent and performing the covenants and complying with the conditions on the part of the Lessee to be performed, as herein set forth, shall, at all times during the term hereby granted, quietly have, hold and enjoy the apartment without any let, suit, trouble or hindrance from the Lessor." PX 33, 34, 35, Article I, ¶ SEVENTH.

In New York, to establish a breach of the covenant of quiet enjoyment, "a tenant must show an ouster, or if the eviction is constructive, an abandonment of the premises." Schwartz v. Hotel Carlyle Owners Corp., 20 N.Y.S.3d 341, 342-43 (1st Dep't 2015). "To establish constructive eviction, a tenant need not prove physical expulsion, but must prove wrongful acts by the landlord that 'substantially and materially deprive the tenant of the beneficial use

and enjoyment of the premises.'" Pac. Coast Silks, LLC v. 247 Realty, LLC, 904 N.Y.S.2d 407, 411 (1st Dep't 2010) (quoting Barash v. Pennsylvania Term. Real Estate Corp., 256 N.E.2d 707 (N.Y. 1970)).

On an issue of apparent first impression, the Court concludes that because the Kofinases and the Corporation executed standard-form proprietary leases, the burden is on the Kofinases to establish that the level of mold in the Units was such that any leaseholder would have been constructively evicted, not just that the mold was not conducive to operating a sterile medical facility.

The Kofinases have asserted that the mold detected in 2020 required them to cease operations and close the Clinic, since it could no longer be used as a medical facility. Trial Tr. 819:22-24. The Kofinases made the decision to close the Clinic after receiving the February mold report, which found "no active growth" of mold, PX 83, but before receiving the May report, which found "mold growth present under the floor" as well as in the air. PX 82. The May report took into account the Kofinases' use of the Units as a medical clinic but did not discuss whether the inspector would have made the same recommendations for remediation had the unit been a residence rather than a medical clinic. Id.

Courts have occasionally found that the presence of mold can constitute the basis for a claim for breach of the covenant of quiet enjoyment. See Sheffield v. Pucci, 114 N.Y.S.3d 817, *11 (N.Y. Sup. Ct. 2019); Ventimiglia v. Tishman Speyer Archstone-Smith Westbury, L.P., 588 F. Supp. 2d 329, 335 (E.D.N.Y. 2008). But the Kofinases'

circumstances are distinct from the existing cases in a crucial way. None of these cases raises the issue of whether a level of mold that might be tolerable, or at least manageable, in a private residence, but that requires thoroughgoing remediation necessitating the temporary evacuation of a medical clinic, constitutes constructive eviction under a proprietary lease for an apartment being used as a clinic. The Court concludes that the Kofinases have not demonstrated that the level of mold in the Units would be intolerable for ordinary residential use of the Units. That they have presented evidence showing the level of mold rendered it impracticable for them to operate a sterile medical clinic does not constitute constructive eviction from units in an apartment building.

To summarize the Court's conclusions regarding the Kofinases' breach of contract claim, to the extent the Kofinases allege that the Corporation breached provisions of the Proprietary Leases and as a result caused property damage, they must demonstrate that the Corporation was negligent. To the extent that they allege business interruption damages, they must show that the Corporation breached the relevant provisions of the Proprietary Leases. For the reasons given above and discussed further in the next section, they have made none of these showings by a preponderance of the evidence.

## II. Negligence

In New York, "the traditional common-law elements of negligence" are "[1] duty, [2] breach, [3] damages, [4] causation and [5]

25

foreseeability." <u>Hyatt v Metro-North Commuter R.R.</u>, 792 N.Y.S.2d 391, 392 (1st Dep't 2005). Because the Court bifurcated this trial, at this stage the Kofinases need only demonstrate duty, breach, causation, and foreseeability (<u>i.e.</u>, proximate cause) by a preponderance of the evidence.

In this regard, the Kofinases first argue that the Corporation "had a duty to keep the foundation walls, concrete slab, the exterior stones located between the sidewalk and the windows of the Clinic . . . and the joint between the building and the sidewalks in good repair." Gesturing to negligence <u>per se</u>, the Kofinases cite the New York Multiple Development Law, § 78(1), which in pertinent part provides that "[e]very multiple dwelling . . . shall be kept in good repair."

The Court's analysis of the duty the Corporation owed the Kofinases must rest on the terms of the Proprietary Leases. As discussed above, throughout this litigation the Kofinases have appeared to assume that the Corporation owed them some higher duty of care because they operate a medical clinic in the Units rather than residing there. <u>E.g.</u>, Trial Tr. 16:15–16 ("this was a sterile fertility clinic at 55 Central Park West that became riddled with mold"). However, the parties executed standard-form Proprietary Leases that make no mention of the Kofinases' intended use of the Units. As a matter of law, the Court finds that the Corporation owes the Kofinases only the same standard of care it owes all lessees.

However, the Kofinases further allege that numerous actions and omissions by the Corporation constitute negligent breaches of the

Corporation's duty of care even as so construed. Under New York law, where a plaintiff bases a negligence claim on the presence of a dangerous condition, the plaintiff must show the defendant had either actual or constructive notice of the condition. "A 'general awareness' that a dangerous condition may be present is legally insufficient to constitute notice of the particular condition." Piacquadio v. Recine Realty Corp., 646 N.E.2d 795, 796 (N.Y. 1994) (quoting Gordon v. Am. Museum of Nat. Hist., 492 N.E.2d 774, 775 (N.Y. 1986)). In the housing context, a landlord's awareness of leaks in other units in the building does not constitute constructive notice of the leak in the plaintiff's unit. Ellisy v. Eklecco, LLC, 868 N.Y.S.2d 82, 83-84 (2d Dep't 2008) (citing Gordon, 492 N.E.2d at 775). However, a defendant may be liable when a second leak, from the same source and location, occurred as a result of the landlord's action or inaction. Lanin v. Thurcon Props., Ltd., 602 N.Y.S.2d 388, 389 (1st Dep't 1993).

The Kofinases' allegations fall into three chronological periods. The Kofinases have not carried their burden of demonstrating that the Corporation breached its duty to them with respect to any of these periods.

The first period, from 2015-2016, includes the time when the Kofinases first discovered and reported water penetration into the Units and when the Corporation elected to perform sidewalk caulking rather than undertaking any more extensive or expensive repair. During this period, the Corporation was on actual notice of the original leak. John Wender presented the Corporation with several options for

remediating the water penetration into the Units. The Corporation chose one of the three measures Wender recommended, and there is no evidence that the chosen measure was improperly performed or failed to address the leak. The caulking of the sidewalk was not predicted to last indefinitely and appears to have held for more than three years — not an unusual lifespan for such a measure. The Court concurs with Defendants that the duty of reasonable care does not include the obligation to choose the most expensive or comprehensive option, only an effective or reasonable one. This is particularly the case when the decision is part of the board's weighing of the corporation's interests as a totality. The Court also finds it significant that Plaintiffs were unable to secure expert testimony to the effect that the Corporation did not act reasonably in choosing the measure it did. Therefore, the Court concludes the Corporation committed no breach during this first period.

The second period, from 2016-2019, covers a period when no leaks were reported. During this time, the Corporation retained Antonucci and Associates to investigate other potential problems in the Building, such as the degradation of steel columns in the basement. As to the Kofinases' Units, the initial remediation measures were holding and the Corporation was on neither actual nor constructive notice of any leaks. It follows that the Corporation committed no breach during this period.

The final period, from 2019 through the time of trial, starts after the Kofinases reported the recurrence of water damage. As

discussed above, the Building chose to prioritize fixing leaks in other units before turning to the remediation of the damage to the Kofinases' Units. As of approximately September 19, 2019, the Corporation was on actual notice. DX G. The Corporation's initial responses were eminently reasonable. It engaged an exterior engineer, Lawless and Mangione. A spray test was conducted in October, which concluded that the caulking at the joint between the Building and sidewalk had failed. Lawless and Mangione recommended measures to remediate the leak, including removing and resetting the stone units below the windows of the Units, removing the sidewalk flags along the building wall, waterproofing the foundation wall, and installing a new sidewalk.

But there was, and as of the time of trial there continued to be, a substantial delay in the Corporation's implementation of Lawless and Mangione's recommendations. In December 2019, Dr. Kofinas reported hearing water under the floorboards and expressed concern about mold. PX 64. Representatives of the Corporation did not timely provide the Kofinases with detailed plans concerning the remediation of the leak. Although Lawless and Mangione's repair plans received all necessary approvals by March 2020, PX 93, by that time the Kofinases' worry and frustration escalated to the point that, as discussed above, they had hired a mold expert and closed the clinic. Not until May 2020 did the Corporation apply a sealant, Chem-Trete, to the outside of the Units, and two applications were necessary in order to create a watertight seal. As of the time of trial, the more substantial repairs to the

foundation wall and sidewalk remained on hold as a result of the Corporation's decision to prioritize fixing leaks in other units.

The Corporation gave the Kofinases, as well as the Court, two rationales for its decision. One was that other shareholders had been suffering from leaks for longer than the Kofinases had. The other was that putting the sidewalk repairs first would have required a further delay, because the sidewalk takes time to cure; additionally, the new sidewalk would be damaged by the shed that would need to be erected for the façade work and would then require further repair. However, a portion of this second rationale, at least as presented in sworn documents submitted by representatives of the Corporation in the state court proceeding the Kofinases initiated, appears to be factually mistaken as to the time needed to cure.

The dispositive question with regard to breach during this third period is whether, in the context of a co-operative corporation's duties to all its shareholders, the Corporation's actions met the standard of reasonable care. With the exception of the inaccurate statement about the length of time needed for the sidewalk to cure, the Corporation's actions were not unreasonable. Had the Corporation sequenced the sidewalk project ahead of the new façade project, leaks in the upper floors would have continued, which would have risked water running inside the Building from higher to lower floors. In addition, sequencing the sidewalk project first would have required the Corporation to expend additional funds to repair the new sidewalk. While the Corporation's conduct was not exemplary — it could have been

30

in closer communication with the Kofinases, and it could have offered or implemented an interim solution sooner — it was not unreasonable at a time when the Corporation owed duties to all of its shareholders that required close balancing and sequencing.

But even assuming arguendo that the Corporation breached its duty in the period from September 2019 onward, the Kofinases have not demonstrated that any such breach caused the damages of which they are complaining. The Corporation was not untimely in the initial steps it took — hiring Lawless and Mangione and submitting repair plans to various regulatory agencies. There is no reason to believe the Corporation should have expected, or could have obtained, regulatory approval for the repairs before early March 2020. Mold was discovered in February 2020. Therefore, any breach by the Corporation that resulted in the delay of repair work cannot be the but-for cause of the mold, the presence of which the Kofinases assert led them to close the clinic. The same analysis is true of Defendant Greenwald's statement in May that there was "no mold." PX 81. It cannot be the but-for cause of the Kofinases' damages.

In addition, there is a problem with causation and foreseeability. Because it is legally insufficient to establish breach for a defendant to have only "general awareness" that there is a dangerous condition, Gordon, 492 N.E.2d at 775, the burden is on the Kofinases to show that the Corporation was on actual or constructive notice of the mold. The Corporation was not on actual notice of mold until after December 11, 2019, when Dr. George Kofinas first mentioned a "concern[] about mold"

in an email to Defendant Greenwald. PX 64. Constructive notice of mold cannot be imputed to the Corporation because the 2015 leak, even if the Kofinases had demonstrated it came from the same source as the 2019 leak, did not result in mold.

In failing to demonstrate breach during any of these three time periods, the Kofinases have not succeeded in making out a case for negligence against the Corporation. The Court concludes both that the Corporation did not breach its duty to the Kofinases, and that, even if it had done so, the Kofinases have failed to demonstrate that any such breach was the but-for or proximate cause of the damages they suffered.

### III. Breach of Fiduciary Duty

The Kofinases make their claim for breach of fiduciary duty against the Individual Defendants. In New York, the elements of a claim for breach of fiduciary duty are "(1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach.'" Meisel v. Grunberg, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009).

Here, no party disputes that board members of a co-operative housing corporation owe fiduciary duties to shareholders. While board members may be personally liable for a corporation's torts, they are generally not liable for the corporation's breach of contract. Fletcher v. Dakota, Inc., 948 N.Y.S.2d 263, 266 (1st Dep't 2012).

As the parties agree, the Kofinases' claim for breach of fiduciary duty turns chiefly on whether the Individual Defendants' decisions in their capacity as board members are protected by the business judgment rule. It is well established in New York that the business judgment rule applies to decisions made by the board of a residential cooperative. The seminal case is Levandusky v. One Fifth Ave. Apt. Corp., 553 N.E.2d 1317 (N.Y. 1990). Levandusky established that, "[i]n the context of cooperative dwellings, the business judgment rule provides that a court should defer to a cooperative board's determination '[s]o long as the board acts for the purposes of the cooperative, within the scope of its authority and in good faith.'" 40 W. 67th St. Corp. v. Pullman, 790 N.E.2d 1174, 1779 (N.Y. 2003), quoting Levandusky, 553 N.E.2d at 1317.

Nevertheless, Levandusky is not a "rubber stamp," and courts have found that "arbitrary or malicious decision making or decision making tainted by discriminatory considerations is not protected by the business judgment rule." Fletcher, 948 N.Y.S.2d at 267. In Levandusky itself, the New York Court of Appeals recognized that "the broad powers of a cooperative board hold potential for abuse through arbitrary and malicious decision making, favoritism, discrimination and the like." Levandusky, 553 N.E.2d at 1320. Courts may review "improper decisions, as when the challenger demonstrates that the board's action has no legitimate relationship to the welfare of the cooperative, deliberately singles out individuals for harmful treatment, is taken

without notice or consideration of the relevant facts, or is beyond the scope of the board's authority." Id. at 1323.

The Kofinases allege that the Individual Defendants breached their fiduciary duty in a variety of ways, which fall into three categories. In none of these categories have the Kofinases proven that the Individual Defendants forfeited the protections of the business judgment rule.

## A. Arbitrary Action

First, the Kofinases argue that the Individual Defendants acted in an arbitrary manner, without considering relevant facts or engaging in appropriate deliberative processes. The Court finds that these arguments are effectively co-extensive with those the Kofinases have made about negligence. New York courts have held that more than mere negligence is necessary to find a co-operative board's conduct arbitrary. See, e.g., Greenberg v. Board of Mgrs. of Parkridge Condominiums, 742 N.Y.S.2d 560 (2d Dep't 2002) (affirming injunction against board because it acted outside scope of authority in prohibiting tenant from erecting a succah on a balcony). The Court finds above that the Kofinases did not establish negligence, and there are no factors that make this case like those in which New York courts have refused to allow co-operative corporations to enjoy the protections of the business judgment rule.

## B. Favoritism

The Kofinases also allege that the Board engaged in favoritism, and therefore failed to act in good faith, by preferring resident

shareholders over the Kofinases. In New York, to make such a claim a plaintiff need not allege that board members acted in self-interest, but must demonstrate that they engaged in something more than merely differential treatment. Showings sufficient to overcome the business judgment rule have been that the board operated in "bad faith," Louis & Anne Abrons Found., Inc. v. 29 E. 64th St. Corp., 746 N.Y.S.2d 482, 484 (1st Dep't 2002); that it took action "meant solely to impact plaintiff," id.; that the board has acted "for purposes of retaliation," Graham v. 420 East 72nd Tenants Corp., 90 N.Y.S.3d 524 (1st Dep't 2019); or that the board has singled out a shareholder for "deliberately abusive treatment," Bregman v. 111 Tenants Corp., 943 N.Y.S.3d 100, 107 (1st Dep't 2012).

None of those circumstances exist here. The Kofinases have not shown that the Individual Defendants engaged with the Kofinases in bad faith, that the Individual Defendants singled the Kofinases out, or that the Individual Defendants retaliated against or abused the Kofinases. It is true that the Board chose to prioritize the interests of some shareholders, including some present and former Board members, over the Kofinases, but that is insufficient on its own. Those other shareholders reported leaks as early as 2018, and a list of thirteen apartments experiencing water damage was published in May 2019. In contrast, the Kofinases only reported the recurrence of water penetration in September 2019. Because the Individual Defendants owed the Kofinases no higher duty of care than they owed other shareholders, they did not engage in favoritism when they decided to build a sidewalk

bridge and address active leaks in apartments on higher floors before engaging in the work necessary to prevent future water damage to the Kofinases' Units. Nor did they engage in favoritism when they responded to leaks reported earlier before those reported later. While representatives of the Corporation may not have been wholly forthcoming about all the factors involved in sequencing the two sets of projects, there is no evidence any Individual Defendant prioritized the projects as they did based on favoritism.

The Kofinases contend that Defendants failed to present evidence of the severity of water penetration in other residential units. But they have inaccurately ascribed this burden to the Individual Defendants. A plaintiff may not overcome the business judgment rule by making "wholly conclusory" allegations concerning favoritism and then attempting to shift the burden to the adverse party. See Captain's Walk Homeowners Assoc. v. Penney, 794 N.Y.S.2d 82, 84 (2d Dep't 2005). The Kofinases' arguments concerning favoritism fail.

## C. Inaccurate Sworn Statements

Lastly, the Kofinases argue that the Individual Defendants breached their fiduciary duty by "directing, ratifying and approving" two inaccurate sworn statements made on the Board's behalf by the Corporation's president Peter Greenwald and counsel Phyllis Weisberg. Greenwald and Weisberg submitted the statements as part of the Corporation's defense against the Kofinases' Article 78 proceeding in New York Supreme Court. As described in the Findings of Fact, the Greenwald and Weisberg statements claimed that the Building

36

prioritized the façade project over the sidewalk project in part because if the sidewalk were excavated first, it needed "a number of months" to cure, and this would delay the start of the façade project. PX 66, 88. However, the construction manual provided by Lawless and Mangione specified a period of 14 days, and testimony at trial suggested that the correct length of time for the sidewalk to cure would be 28 days. Trial Tr. 692:12-693:3.

It is not necessary for the Court to reach the question of whether there is a breach of fiduciary duty if a fiduciary of a cooperative corporation submits a false statement in a collateral proceeding involving one of the corporation's shareholders. Even assuming arguendo that ratifying the Greenwald affidavit and Weisberg affirmation constitutes misconduct on the Individual Defendants' part sufficient to override the business judgment rule, the Kofinases have not made out the other elements of a claim for breach of fiduciary duty. They have not argued, much less demonstrated, that the submission of the affidavit and affirmation caused any of the harms for which they seek redress. The Kofinases do not and cannot contend, for instance, that had the affidavit and affirmation in August 2020 been factually correct, the Building would have in fact prioritized the sidewalk project over the façade project in March 2020.

The Individual Defendants did not act arbitrarily, nor did they engage in favoritism, nor did their conduct in ratifying inaccurate sworn statements cause the injuries the Kofinases are alleging in this litigation. The Court concludes that the decisions of the Individual

Defendants were protected by the business judgment rule and, therefore, finds for the Individual Defendants on the Kofinases' breach of fiduciary duty claim.

### IV. Aiding and Abetting Breach of Fiduciary Duty

The Kofinases' claim for aiding and abetting breach of fiduciary duty is against Frederick Rudd and Rudd Realty Management Corp., collectively the Managing Agent. Under New York law, the elements of a claim for aiding and abetting a breach of fiduciary duty are: "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009) (internal citation omitted).

Because there was no breach of fiduciary duty, the Kofinases' claim against the Managing Agent falters out of the gate. It is not necessary to reach the remaining two elements. The Court finds for the Managing Agent on the Kofinases' claim for aiding and abetting breach of fiduciary duty.

### Conclusion

For the foregoing reasons, the Clerk is hereby directed to enter final judgment in favor of Defendants. Because there is therefore no need for a second phase of the trial with regard to damages, the Clerk is further directed to close the case.

SO ORDERED.

Dated:     New York, NY

       July 26, 2021

                                                  JED S. RAKOFF, U.S.D.J.